**ERSAN RESOURCES, INC., Plaintiff,**

v.

**Zita King KIRATLI, Defendant,**

and

**Dundar OZEY, Defendant and Third–Party Plaintiff**

v.

**Erhan OZEY, Third–Party Defendant.**

Civ. A. No. 2:92cv464.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 19, 1993.

Carter Branham Snow Furr, Jett, Berkley, Furr & Padgett, Norfolk, VA, for Ersan Resources, Inc. and Erhan Ozey.

Morton Hutchinson Clark, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Zita King Kiratli and Dundar Ozey.

## ORDER

CLARKE, District Judge.

This matter is before the Court on the Complaint of Plaintiff, Ersan Resources, Inc. ("Ersan Resources"), asking this Court to 1) declare Ersan Resources the lawful owner of the motor yacht ERSAN; 2) grant judgment against the defendants Zita King Kiratli and Dundar Ozey for their fraudulent attempts to deprive the plaintiff of its vessel; 3) award punitive damages against them for their fraudulent attempts to deprive the plaintiff of its lawful title and possession to the ERSAN; and 4) grant a permanent injunction against them prohibiting them from interfering with the plaintiff's title and possession of the yacht ERSAN. For the reasons set forth below, the Court FINDS Ersan Resources to be the owner of the ERSAN and enters a permanent injunction against defendants from interfering with plaintiff's ownership and use of the ERSAN.

## FACTS

This case concerns the ownership of a 65′ long range cruiser, the ERSAN. After hearing three days of trial testimony and argument on the fourth day, weighing the credibility of witnesses and considering the memoranda and exhibits filed in this case, the Court makes the following findings of fact and conclusions of law. In 1985, Hatteras Yachts, Inc., located in New Bern, North Carolina, built the ERSAN [1] for Ersan Ticaret, Ltd. ("Ersan Ticaret"), a Turkish corporation which is 100% owned by

---

**1.** Its hull number is 65LR312, and its hull identification number is HATBX312K586.

Dundar Ozey ("Dundar"). On March 4, 1986, Dundar, as president of Ersan Ticaret, transferred 100% interest in the ERSAN to Zita King Kiratli ("Zita"), a U.S. citizen, in order to obtain a U.S. registry for the yacht.[2]

Zita then obtained a Certificate of Documentation from the U.S. Coast Guard in Norfolk, Virginia, by certifying that she was the sole owner of the ERSAN and a U.S. citizen. The Coast Guard assigned the ERSAN an official number, 694248. In support of the application for documentation Zita filed a Certificate of Marking stating the vessel's name as the ERSAN and that its hailing port, Baltimore, Maryland, had been painted on the vessel.[3] A picture of the vessel introduced in evidence showed the absence of a hailing port painted on the vessel. There is also evidence that these markings were removed from the yacht.[4]

On May 15, 1986, Zita gave Dundar a power of attorney which gave him "all powers, discretions, elections and authority to sell, convey, lease, exchange, mortgage, pledge, release, hypothecate, or otherwise deal with, dispose of, exchange or encumber [the] yacht." Exhibit ("Ex.") 13. On January 29, 1989, pursuant to this power of attorney and without notice to Zita, Dundar sold the ERSAN to Orada, Ltd. ("Orada"). Orada then registered the ERSAN in Great Britain. On May 25, 1989, after learning of this sale, Zita wrote to the Norfolk Coast Guard as the "former owner" of the ERSAN requesting it to cancel the Norfolk documentation.

In 1989, Dundar ordered a new 65' yacht, the ERSAN V, to replace the one sold to Orada. In order to obtain U.S. documenta-

tion for the yacht, Dundar and his son, Erhan Ozey ("Erhan") incorporated Ersan Resources, Inc. ("Ersan Resources") in Oklahoma on June 28, 1989, "to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Oklahoma," Ex. 4, and to own the ERSAN V. Dundar originally thought Ersan Resources would also be an operating corporation engaged in both international trade and trade in Oklahoma. At the first corporate meeting, Margaret Keeling Ozey ("Margaret", Erhan's then-wife) was elected director, president and chief executive officer of the corporation, Erhan was elected vice president and Linda Lipka was elected secretary. The corporation issued 800 shares of stock to Margaret in exchange for $800 and 200 shares to Dundar in exchange for $200 and "all right, title and interest in and to a motor yacht at a book value to be later determined." Ex. 4.

On Dundar's instructions Hatteras Yacht, Inc. then conveyed the ERSAN V[5] to Ersan Resources who obtained a Certificate of Documentation from the U.S. Coast Guard in St. Louis, Missouri, certifying that it owned the ERSAN V and that Margaret, its president and chairman of the board, was a U.S. citizen and owned at least 75% of Ersan Resources' stock. Margaret signed the application for documentation and the marking certificate on behalf of Ersan Resources as its president. Pursuant to this information and a Certificate of Marking filed by the corporation, the Coast Guard assigned the ERSAN V an official number, 955523, and issued its Certificate of Documentation setting forth the

2. Dundar kept his yachts at the Kusadasi Marina in Turkey. The evidence is clear that Dundar documented his yachts in the United States in order to avoid a 150–160% tax imposed on Turkish yachts in Turkey, ensure safer and easier travels in the Mediterranean and avoid disclosure of his sources of income to Turkey. Trial testimony further indicated that Dundar had paid for the yacht from a Swiss bank account.

3. The official number is required to be "permanently marked in block-type arabic numerals not less than three (3) inches in height on some clearly visible interior part of the hull and that

number cannot be obliterated or obscured." Certificate of Marking at TE 2 & 3. The name and hailing port must be "marked together in clearly legible and durable letters not less than four (4) inches in height on a clearly visible exterior part of the hull." *Id.*

4. Nonetheless, the Court finds it unnecessary to determine in this case whether the hailing port had ever been painted on the boat as Zita certified.

5. Its hull number is 65MY318, and its hull identification number is HATDL318F989.

vessel's name as ERSAN V and its hailing port as St. Louis, Missouri.

In June of 1990, pursuant to a power of attorney given by Ersan Resources and signed by Margaret as its president, Dundar traded the ERSAN V with Orada for the ERSAN plus $200,000. Accordingly, on September 28, 1990, Orada gave Ersan Resources a bill of sale for the ERSAN. Thereafter, Ersan Resources applied to the St. Louis Coast Guard for a Certificate of Documentation for the ERSAN relying on the ERSAN's British registry and the bill of sale. Again Margaret Keeling represented to the Coast Guard that she was Ersan Resources' director, president and chairman of the board, a U.S. citizen, and owned at least 75% of Ersan Resources' stock and that the hailing port was properly painted on the hull. Consequently, the Coast Guard in St. Louis issued a Certificate of Documentation for the ERSAN with a new official number, 973155, and new measurements.[6]

Zita's ownership of the ERSAN and Ersan Resources' ownership of the ERSAN V and later the ERSAN was satisfactory at the time to all parties involved. Dundar abided by and benefited from this arrangement for two years. Because of the U.S. documentation of the vessels, he avoided exorbitant Turkish taxes and was able to travel securely in and out of ports in the Mediterranean. In order to use the yachts he obtained powers of attorney from both Zita (for the ERSAN) and Margaret (for the ERSAN V and the ERSAN). Moreover, Ersan Resources was a lawful corporation; it complied with all formalities of law in maintaining its corporate existence.[7] It had annual meetings and paid its franchise fees and taxes. Dundar, however, paid for all the maintenance and other expenses and the insurance for the yachts until this ownership dispute developed.

It was not until November of 1991 that affairs began to sour. Two events occurred which apparently precipitated the present litigation. Dundar was hospitalized for his diabetes. Thus, he gave his then-wife, Necla Ozey ("Necla"), a General Power of Attorney so that she could run his business affairs. However, their marriage was having problems, and thereafter Necla transferred Dundar's 20% interest in Ersan Resources to Erhan.[8]

Erhan too was having marital difficulties. On January 14, 1992, he and Margaret divorced. Their property was divided along family lines and pursuant to a prenuptial agreement; each basically received what he/she brought into the marriage. Since Ersan Resources was formed during their marriage and thus was not included in the prenuptial agreement, they agreed that the stock in the corporation would go to Erhan. Accordingly, this agreement was made a part of the divorce decree issued by the Oklahoma court. Although Margaret assigned her 80% interest to Erhan, she did not note his name on the stock certificate in what she termed an "open" assignment. Margaret then gave notice of her resignation as president from Ersan Resources in what she termed an "open letter of resignation." She was aware at the time she endorsed the stock certificate in blank and wrote the letter of resignation that there were reasons why the stock would not be transferred immediately and the letter of resignation would not be accepted immediately. She further knew that the date of Erhan's naturalization as an American citizen was the determinative factor in when the transfer and acceptance of the stock and letter of resignation respectively would take place.

On February 14, 1992, Erhan was elected president and became a U.S. citizen. On that same date Ersan Resources issued the stock certificate in Erhan's name. It was

---

**6.** Neither Margaret nor the St. Louis Coast Guard knew of the prior Norfolk registration.

**7.** Dundar however refused to disclose the value of the yachts to the corporation. Accordingly, they could not be placed in the corporate records.

**8.** The Court finds it unnecessary to determine whether the transfer arose out of the marital difficulties or some other reason.

only after the family upheaval, a consequence of which Erhan obtained 100% of the stock in Ersan Resources, did Dundar challenge the corporate ownership of the yacht.

During Dundar's hospitalization, Ersan Resources hired a captain, Ali Hayta, to maintain the ERSAN. On March 9, 1992, it paid all the accrued marina and maintenance fees and insurance for the yacht and has continued to do so to date. Nonetheless, once Dundar recovered, he brought suit against his wife to invalidate her power of attorney. Necla however voluntarily rescinded it.[9] Dundar also had Hayta removed from the ERSAN. Consequently, Erhan attempted to take possession of the ERSAN using the St. Louis documentation to show that Ersan Resources owned it. Since the marina manager knew Dundar, he declined to accept Erhan's representation of ownership. Erhan then instituted proceedings in the Turkish courts to establish title to the yacht in the name of Ersan Resources.

Dundar intervened in the Turkish suit first claiming that he was the owner of the yacht pursuant to a British registry. When this argument failed, he directed Zita Kiratli, in May of 1992, to redocument the ERSAN with the Norfolk Coast Guard. On May 12, 1992, Zita had the ERSAN's Certificate of Documentation reinstated by notifying the Coast Guard in Norfolk that the 1989 sale to Orada had fallen through. Again she certified that she was a U.S. citizen who owned 100% of the yacht. No mention was made of the ERSAN's documentation in Missouri. Dundar returned to the Turkish court with this certification claiming that Zita was the owner of the ERSAN, he had a power of attorney from her, and he thus should be given possession of the yacht.

Upon the request of the harbor master in Kusadasi, Turkey, the Norfolk Coast Guard informed him that the ERSAN was documented both in Norfolk, Virginia with an official number 694248, and in St. Louis, Missouri, with an official number 973155. It further noted that the ownership of the ERSAN was disputed thus requiring a U.S. court decision of ownership. Based on this information, the Turkish court declined to determine ownership until the controversy in the United States was resolved. The Turkish proceedings were continued until January 22, 1993, presumably to give this Court an opportunity to determine ownership of the vessel which is under U.S. registry.

On June 18, 1992, Ersan Resources filed a Complaint against Zita in this Court alleging therein that it is the lawful owner of the motor yacht ERSAN. It traces its chain of title back to the trade of the ERSAN V with Orada for the ERSAN. On July 8, 1992, Ersan Resources asked this Court for an injunction to prevent Zita or anyone acting on her behalf from taking possession or other action against the ERSAN until this Court ruled on the ownership of the yacht. This temporary injunction was granted on July 16. On July 14, 1992, Zita filed an Answer stating she is the lawful owner of the ERSAN. She denies Ersan Resources' ownership by claiming that the first sale of the ERSAN by Ersan Ticaret to Orada and the trade from Orada back to Ersan Resources were not lawful. Specifically, she argues that the bill of sale transferring the ERSAN to Orada from "Dundar Ozey by Ersan Ticaret, Ltd" did not transfer title to Orada since she did not authorize Ersan Ticaret to convey the yacht to anyone.[10]

On August 26, 1992, Ersan Resources made a motion to add Dundar as a defendant in the case based on a letter defense counsel wrote to plaintiff's counsel stating that "Zita King Kiratli was merely the 'titular owner' of the yacht ERSAN, as a matter of convenience to Dundar Ozey." Motion to Add Dundar Ozey As A Defen-

---

9. There is no evidence that Dundar has brought any proceedings in Turkey or Oklahoma challenging the transfer of the 20% stock in Ersan Resources to Erhan pursuant to Necla's power of attorney.

10. The power of attorney from Zita to Dundar did give Dundar the right to transfer or convey the ERSAN, and the bill of sale was in fact signed by "Dundar Ozey."

dant at 1. This motion was granted on August 31, and Ersan Resources accordingly filed an Amended Complaint adding Dundar and alleging the defendants (Zita and Dundar) "attempted through fraud and collusion to deprive the plaintiff of its valuable yacht the 'Ersan' by attempting to obtain possession and title of said vessel in Kusadasi, Turkey." Amended Complaint at 1. Ersan Resources asks this Court to 1) declare it the lawful owner of the ERSAN; 2) grant judgment against the defendants for their fraudulent attempts to deprive the plaintiff of its vessel; 3) award compensatory damages of at least $50,000, punitive damages in the amount of $250,000, attorney fees, costs and prejudgment interest against the defendants for their fraudulent attempts to deprive the plaintiff of its title to and possession of the ERSAN; and 4) grant a permanent injunction against the defendants prohibiting them from interfering with the plaintiff's title and possession of the ERSAN.

In their Answer, dated September 16, 1992, to the Amended Complaint, Zita and Dundar assume many contradictory positions, as they did throughout the trial. They deny that Dundar was acting under his power of attorney from Zita when he purportedly sold the ERSAN to Orada; however, they also admit that Dundar sold the ERSAN to Orada and later traded the ERSAN V for it. Defendants further assert that ERSAN's title was transferred to Ersan Resources at that time merely for U.S. documentation purposes. Since Dundar paid the purchase price of both the ERSAN V and the ERSAN from funds in his personal account, he claims he is the equitable owner of the ERSAN, Zita is merely the "titular owner" of the yacht and thus he should be awarded possession.

On September 22, 1992, Dundar filed a Third–Party Complaint against Erhan realleging that he, Dundar, is the equitable owner of the ERSAN and that neither Zita nor Ersan Resources have any financial interest in the vessel. Dundar admits that Ersan Resources was formed to hold title to the ERSAN V and the ERSAN in order to obtain U.S. documentation and asserts that Erhan's representations to this Court

that Ersan Resources is the owner of the ERSAN are based on "misrepresentation[s] of facts, fraud and deceit." Dundar asks this Court to enjoin Erhan from taking any further actions to gain possession and control of the ERSAN in Turkey, grant Dundar ownership of the vessel plus $100,000 in damages resulting from Erhan's fraudulent attempts to gain possession of the vessel and award him $100,000 in punitive damages for Erhan's alleged misrepresentations of facts, fraud and deceit and conversion of the ERSAN.

On October 6, 1992, this Court granted the injunction and enjoined all parties from seeking a determination of ownership in the Turkish courts. Pursuant to an agreement by the parties, the Court further declared that Ersan Resources and/or Erhan would be responsible for the maintenance of the ERSAN until the final determination of ownership was made at the trial to commence on January 6, 1993.

On October 13, 1992, third-party defendant Erhan answered Dundar's Third–Party Complaint asserting that Ersan Resources was lawfully formed to hold title to the ERSAN V and the ERSAN and that Dundar agreed and benefited from this arrangement until the family problems began in late 1991. Accordingly, Dundar should be estopped from denying Ersan Resources' ownership. On November 27, 1992, defendants requested a continuance of the trial scheduled for January 6, 1993 until the following week since Dundar was not a party at the time the pretrial conference was held. Defendants further alleged that January 6th was not convenient for Dundar. On December 4, 1992, the Court denied defendants' Motion for a Continuance.

### CORPORATE OWNERSHIP OF THE VESSEL

The evidence is clear and the parties do not dispute that Dundar used Zita Kiratli and Ersan Resources to hold legal title to the ERSAN and the ERSAN V in order to obtain U.S. documentation and avoid pay-

ing considerable Turkish taxes.[11] The issues which are thus before the Court are whether Dundar is estopped from denying the corporate ownership of the vessels or whether Dundar obtained equitable ownership of them through Ersan Resources' corporate organization.

U.S. registration with the Coast Guard is voluntary for vessels that do not operate in the waters of the United States. 46 C.F.R. § 67.01–7 (1991). To be documented, a vessel must be of at least five tons and wholly owned by U.S. citizens. 46 U.S.C. § 12102 (1992); 46 C.F.R. §§ 67.01–7, 67.01–9 (1991). An individual citizen may register the vessel. A corporation may do so as well if:

(1) It is incorporated under the laws of the United States or of a State;

(2) Its president and, if the president is not the chief executive officer, its chief executive officer, by whatever title, is a citizen;

(3) Its chairman of the board of directors is a citizen; and

(4) No more of its directors are noncitizen than a minority of the number necessary to constitute a quorum.

46 C.F.R. § 67.03–9 (1991). Additionally, at least 75% of the corporation's stock issued must be owned by U.S. citizens. There is a $500/day civil penalty for the violation of the documentation requirements, 46 U.S.C. § 12122(a) (1992), and a criminal penalty of up to $10,000 in fines and/or up to five years imprisonment for knowingly and willingly making false statements of material fact to an agency of the United States. 18 U.S.C. § 1001 (1976).

The application for documentation unambiguously sets forth the U.S. citizenship requirement. For example, an individual must certify that "all owners of [the] vessel are citizens of the U.S" and a corporate applicant must state its state of incorporation, citizenship of its Chief Executive Officer and Chairman of the Board, the number of directors necessary to constitute a quorum and the percentage of stock owned by U.S. citizens. Certificate of Documentation at Ex. 2 & 3. Moreover, the applicant must attest to the truthfulness of the facts given in the application, that he/she is a U.S. citizen and that he/she is "legally authorized to execute [the] application in the capacity [in which it is signed]." *Id.*

In this case Dundar influenced, induced and directed others to execute documents and file them with an agency of the U.S. government stating that the ERSAN was first owned by Zita and then by Ersan Resources and that the ERSAN V was owned by Ersan Resources. Defendants are correct in that although not conclusive, a certificate of documentation is prima facie evidence of ownership. 46 U.S.C. § 12104 (1992). The underlying sale of the vessel is also indicative of ownership. *In re Banner Yachts, Inc.,* 144 B.R. 985 (Bkrtcy.N.D.Ohio 1992); *Chase Manhattan Fin. Servs., Inc. v. McMillian,* 896 F.2d 452 (10th Cir.1990); *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co., Inc.,* 666 F.2d 932 (5th Cir.1982); *Meacham Corp. v. United States,* 207 F.2d 535 (4th Cir.1953), *cert. dismd,* 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1954); *ITT Indus. Credit Co. v. M/V Richard C.,* 617 F.Supp. 761 (E.D.La. 1985).

In this case, the certificate of documentation along with the evidence that the bill of sale for the ERSAN was made to Ersan Resources,[12] Dundar used the corporate form for his benefit, and the clear language of the statute and application forms necessitate holding Dundar to his placement of ownership of the yachts in the corporation. He used this format to his advantage and cannot now come to this Court denying the corporate ownership. To hold otherwise would make a mockery

---

**11.** Both Dundar and Zita testified to this at trial and admit this in their pleadings. There is also evidence and the Court finds as fact that the U.S. registry facilitated travel in and out of ports in the area where Dundar used the two vessels.

**12.** The Builder's Certification for the ERSAN indicates the vessel was built for Carolina Hatteras, Inc., and the Bill of Sale indicates that Carolina Hatteras, Inc. transferred the vessel to Ersan Resources, Inc.

of the law. Any alien could own a U.S. documented vessel by use of a strawperson who would hold a meaningless title. Surely this could not have been Congress' intent.

Dundar next argues that despite the corporate ownership of the ERSAN, he is its "equitable owner" as he paid for the yacht from his personal accounts and paid for all its upkeep and expenses as well. This argument must also fail for three reasons. First, neither the statute nor the applicable federal regulations mention a distinction between legal or equitable ownership. During the notice and comment period of the statute it was noted that the plain meaning of the statute should guide its implementation. *See* 54 Fed.Reg. 41,992 (1989) (to be codified at 46 C.F.R. § 67). Only the word "owner" is used in the statute, *see e.g.* 46 U.S.C. §§ 12102, 12103, 12122 (1992); more importantly, "wholly owned" is used in the regulations. *See e.g.*, 46 C.F.R. §§ 67.01–9, 67.03–1 (1991).

Second, basic corporation law provides that a contribution to capital becomes the property of the corporation and not of the contributing stockholder. *See United States v. Wallach*, 935 F.2d 445 (2nd Cir. 1991) (shareholders do not hold title to the corporation's property); *In re Cash Currency Exchange, Inc.*, 52 B.R 577 (Bkrtcy. N.D.Ill.1985) ("ownership of corporate property vests in the corporation"). Only when the contributing stockholder specifies in writing that the property contributed is merely a loan and thus not the corporation's property is the stockholder entitled to the equity in the contributed property. *In re Argo Communications Corp.*, 134 B.R. 776 (Bkrtcy.S.D.N.Y.1991) (a repayment schedule or demand is required for stockholder to retain interest in the contributed capital); *In re B & L Laboratories, Inc.*, 62 B.R. 494 (Bkrtcy.M.D.Tenn.1986) (loan to corporation is actually a contribution to capital where there is no evidence that the shareholder has "unconditional right to demand repayment evidenced by a formal written instrument").

There is no evidence of such an arrangement here. In fact, when Dundar transferred the ERSAN V to Ersan Resources, he conveyed "*all* right, title and interest in and to a motor yacht at a book value to be later determined." Ex. 4 (emphasis added). There is no indication of Dundar retaining any equitable ownership, and the use of "all" indicates it was not implicitly agreed to either. When the ERSAN V was replaced by the ERSAN in corporate ownership, it is only logical that Ersan Resources received all rights to the ERSAN as well.

Third, in asserting equitable ownership to the ERSAN, Dundar comes to this Court with unclean hands. If he intended to retain ownership of the ERSAN, this implies he had his agents, Zita and Margaret, falsely file documents on his behalf in violation of the laws of the United States. He may not now be heard to profit by his criminal conduct by saying to the contrary. *Terry v. Yancey*, 344 F.2d 789 (4th Cir.1965) ("where an individual creates a corporation as a means of carrying out his business purposes he may not ignore the existence of the corporation in order to avoid its disadvantages"); *cf. Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804 (Fed Cir.1990) (Withholding information from a patent and trademark office during the prosecution of an application may so soil the patent applicant's hands as to render all patents in the suit unenforceable); *Callanan Road Improvement Co. v. United States*, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206 (1953) (an appellant cannot take a contrary position to that invoked to obtain benefits earlier); *Admiral Towing Co. v. Woolen*, 290 F.2d 641 (9th Cir.1961) (same); *MedX, Inc. v. Ranger*, 788 F.Supp. 288 (E.D.La.1992) (Equity will not protect one who enters into a contract with the intention of breaking it).

Dundar lastly claims Erhan defrauded Margaret out of her 80% stock in Ersan Resources. He asserts that Erhan must be bound by an alleged statement Erhan made to Margaret informing her that the corporation had no assets because Dundar really owned the ERSAN, the company's only asset. Margaret and her divorce lawyer testified to such statement being made during a property settlement conference; Erhan

and his divorce lawyer assert that no such statement was made.

The Court finds the testimony of Erhan and his lawyer to be more credible. Margaret's lawyer, who had trouble remembering her own office address, could not remember whether the alleged statement was made during a break in negotiations or at the end of negotiations. The evidence established that Margaret had five years experience as a manager of a chiropractic practice and was actively involved with her wealthy father and sister in several business enterprises. Further her father was present at the conference at which the alleged "no value" statement was made. Certainly Margaret and her father were experienced enough business people to make their own judgment about the ownership of the ERSAN. Moreover, Margaret agreed to making the property settlement agreement which transferred her stock in Ersan Resources to Erhan as part of the divorce decree, and there is no evidence that she has tried to have that decree set aside for fraud or any other reason.

Even if Erhan made the statement, it would have been made in the context of a negotiation conference where each side was "posturing"; such a statement could not be considered as a serious and legally binding commitment. In any event, Margaret, as president and chairman of the board of Ersan Resources, cannot claim she was in the dark when it came to matters concerning corporate assets. For the foregoing reasons the Court FINDS that Erhan Ozey did not make any legally or factually significant statement to Margaret Ozey acknowledging Dundar Ozey's ownership of the ERSAN.

## CONCLUSION

The Court FINDS that Ersan Resources, Inc. is the lawful owner of the ERSAN and that Erhan Ozey is its sole stockholder and President. Defendants Zita King Kiratli and Dundar Ozey are permanently enjoined from interfering with Ersan Resources' right to ownership and possession of the ERSAN. Accordingly, the U.S. Coast Guard in Norfolk, Virginia is ORDERED to cancel the documentation of the ERSAN. The Court approves and ratifies the St. Louis, Missouri Coast Guard's documentation of the ERSAN in the name of Ersan Resources, Inc. The Court declines to award Erhan Ozey $7,216.55 in compensatory damages ($2,800 for air fare costs to Erhan Ozey and $4,416.55 for legal fees incurred in Turkey) as these costs were incurred in furtherance of the determination of ownership of the ERSAN, and no authority has been cited to cause this Court to depart from the American rule that each party pays his own preparation and trial costs except the taxable court costs imposed by the clerk.

IT IS SO ORDERED.